## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE BOARDS OF TRUSTEES FOR THE CARPENTERS HEALTH AND SECURITY TRUST OF WESTERN WASHINGTON AND FOR THE GROUP INVESTMENT TRUST OF THE CARPENTERS INDIVIDUAL ACCOUNT PENSION TRUST OF WESTERN WASHINGTON AND CARPENTERS RETIREMENT TRUST OF WESTERN WASHINGTON, <br><br> Plaintiffs, <br><br> v. <br><br> ALLIANZ GLOBAL INVESTORS U.S. LLC, ALLIANZ GLOBAL INVESTORS U.S. HOLDINGS LLC, ALLIANZ SE, ALLIANZ ASSET MANAGEMENT GMBH, ALLIANZ OF AMERICA, INC., ALLIANZ ASSET MANAGEMENT OF AMERICA HOLDINGS INC., ALLIANZ ASSET MANAGEMENT OF AMERICA LLC, ALLIANZ ASSET MANAGEMENT OF AMERICA LP, AND PFP HOLDINGS INC., <br><br> Defendants. | Case No. 20-cv-9479 <br><br> **COMPLAINT** <br><br> DEMAND FOR JURY TRIAL <br><br> **ECF CASE** |

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................. 1

II.    PARTIES AND OTHER ENTITIES.................................................................. 10

     A.     Carpenters Trusts of Western Washington .......................................... 10

     B.     Defendants ............................................................................................ 11

III.   JURISDICTION AND VENUE ........................................................................ 16

IV.  FACTUAL ALLEGATIONS ............................................................................ 17

     A.     Background of the Allianz Global Investors Enterprise ....................... 17

     B.     AllianzGI's Duties to Carpenters Trusts and the Alpha Funds
           Mandate ................................................................................................ 21

     C.     AllianzGI's Duties to Carpenters Trusts Included Ensuring That
           the Alpha Funds Were Adequately Hedged to Protect Investors
           Against Downside Risk.......................................................................... 29

     D.     AllianzGI Abandoned Needed Risk Protections Amid Widespread
           Evidence of an Impending Market Downturn ....................................... 34

     E.     AllianzGI's Imprudent Investments and Self-Interested
           Mismanagement in March 2020 Locked in the Alpha Funds'
           Losses.................................................................................................... 40

     F.     In a Desperate Attempt to Stem Losses, Allianz Manipulated A
           Key Volatility Index to Inflate the Alpha Funds' Valuations.............. 46

     G.    Following the Anticipated Market Conditions in February and
           March 2020, AllianzGI Liquidated Alpha 1000 Plus and
           Carpenters Trusts Withdrew Its Remaining Investments in Alpha
           250 and Alpha 500 ............................................................................... 49

V.    PRAYER FOR RELIEF ................................................................................... 64

VI.  JURY DEMAND.............................................................................................. 65

Plaintiffs the Boards of Trustees for the Carpenters Health and Security Trust of Western Washington and the Group Investment Trust of the Carpenters Individual Account Pension Trust of Western Washington and the Carpenters Retirement Trust of Western Washington (the "Trusts"), and for the Carpenters Health and Security Plan of Western Washington, the Carpenters of Western Washington Individual Account Pension Plan, and the Carpenters Retirement Plan of Western Washington (the "Plans," and collectively, with the Trusts, "Carpenters Trusts"), by and through the undersigned counsel, alleges the following against Defendants Allianz Global Investors U.S. LLC ("AllianzGI"), the Allianz Global Investors defendants (defined fully below), Allianz of America, Inc. ("Allianz of America") and Allianz SE ("Allianz SE") (Defendants AllianzGI, the Allianz Global Investor defendants, Allianz of America and Allianz SE may be referred to collectively as the "Allianz Defendants" or "Allianz") and asserts breach of fiduciary duty claims under the Employee Retirement Income Security Act of 1974 ("ERISA") and breach of common-law fiduciary duties, negligence and breach of contract claims arising from misconduct and gross mismanagement of three investment funds:  the AllianzGI Structured Alpha U.S. Equity 250 LLC ("Alpha 250"), the AllianzGI Structured Alpha 500 LLC ("Alpha 500"), and the AllianzGI Structured Alpha 1000 Plus LLC ("Alpha 1000 Plus," and together with Alpha 250 and Alpha 500, the "Alpha Funds" or "Funds").

## I.    INTRODUCTION

1.    This case is about a fiduciary that improperly invested client assets, employed a reckless strategy contrary to its obligations to Carpenters Trusts, and abandoned the risk controls it was required to have in place.  As set forth below, AllianzGI violated its contractual obligations and fiduciary duties by abandoning the Funds' stated investment mandate and required downside risk protection positions, and then "doubled down" on its imprudent strategy after incurring losses at the very time when positions to protect against a market downturn were needed most.

2.     Rather than protect against the market downturn that Allianz's own chief economist had been warning about since January 2020 by ensuring that the Funds remained market neutral and contained the "tail risk" hedging positions that were supposed to be the cornerstone of the Alpha Fund strategy, AllianzGI positioned the Funds' portfolios in a manner that all but guaranteed substantial losses once that downturn came to pass.  AllianzGI has since admitted that its positioning of the Funds' portfolios in late February and early March 2020 was done to "recoup" the losses the Funds incurred in February.  However, the portfolios' positions left the Funds dangerously exposed to even the slightest increase in market volatility or decline in equity prices— the very conditions that Allianz economists, and many others, warned were on the immediate horizon.  AllianzGI did not simply make a bad call in the midst of a market disruption: it abandoned the Funds' investment mandate—repeatedly touted by Allianz and memorialized in contracts with Carpenters Trusts—that the risk management and investment strategies employed by AllianzGI were designed to protect the Alpha Funds' investors against precisely the types of market conditions experienced in February and March of 2020.

3.     AllianzGI's extraordinarily risky and self-interested gamble resulted in massive losses for Carpenters Trusts, wiping out, in a matter of weeks, hundreds of millions of dollars of employees' retirement, disability and health benefits that had been accumulated over lifetimes.

4.     The Alpha Funds were three investment vehicles marketed by Allianz Global Investors and managed at all times under the full investment discretion of AllianzGI.  Carpenters Trusts were passive investors in the Alpha Funds, having ceded all discretion to their fiduciary, AllianzGI.  Broadly, the Alpha Funds pursued a "market-neutral" strategy that invested in indexes and fixed income instruments to replicate the performance of a given benchmark while simultaneously pursuing an actively managed options trading strategy.  The Alpha Funds'

purportedly unique "alpha" component—the actively managed options strategy overlay—was supposed to provide investors with downside protection and possible upside in both bull and bear equity markets, and in times of both high and low volatility.

5.     Generating returns in times of rising or falling equity markets and both low and high market volatility—*i.e.*, the price movement up and down of an investment or index compared to its average, and which typically increases in times of economic or investor uncertainty—was a key part of the Funds' strategy.  As Allianz Global Investors stated in the Funds' marketing materials, which are incorporated into the agreements between Carpenters Trusts and AllianzGI that defined the duties of AllianzGI, the Funds were structured "to perform irrespective of the market environment" and to "never make a call on the direction of equities or of volatility." Specifically, the strategy was to pursue risk-controlled returns by buying and selling put and call options on US equity and volatility indexes in a manner that would weather different market environments due to the continual optimization of three types of trading positions.

6.     Further underscoring the supposedly conservative nature of the strategy, Allianz described its core investment objectives as including "[p]rotect[ing] against a market crash," and "[n]avigat[ing] as wide a range of equity-market outcomes as possible," and to "[p]rofit during normal market conditions (up / down / flat)."

7.     Critically, in pursuing these objectives, the Alpha Funds were to be conservatively managed and protected "in the event of a market crash," by adhering to three core tenets.  First, the Funds were to be "[l]ong and short volatility at the same time, at all times"—ensuring the Funds would benefit in times of both decreasing and increasing volatility.  Second, AllianzGI committed to pursuing a market neutral strategy in which the Funds would "[n]ever make a call on the direction of equities or of volatility."

3

8.    Third, AllianzGI would guard against adverse market environments by employing "hedging positions" that were specifically designed to protect against a market downturn and employed solely for risk management purposes.  Specifically, the Funds' portfolios were to always "[b]uy put options – in a greater quantity than sold – to protect the portfolio in the event of a market crash/closure" which Allianz explained provided "protection against a tail event or a market crash" and were "embedded in the portfolio at all times."  These long hedging positions were "designed for tail risk protection, not for outperformance potential, but are a key feature of the strategy's risk management."

9.    The Alpha Funds' investment mandate required active portfolio management and close monitoring to ensure the portfolios were properly protected against a market crash and positioned to be both short and long volatility as market conditions changed—a portfolio construction that necessarily required stringent risk management policies and protocols to ensure that the strategy worked as required by the contracts and other representations that defined Allianz's duties.  Specifically, the Alpha Funds strategy was intended to "[a]dapt nimbly to changing market conditions" and to "[a]djust long-short balance based on proprietary quantitative signals about the shape of the volatility curve."  To do so consistent with the Alpha Funds' investment mandate, Allianz purportedly ran "[r]eal-time risk monitoring, as well as analysis of statistically significant equity-market scenarios" to stress test the portfolio under the very kinds of market conditions that occurred in February and March 2020, and the Funds were supposed to have "[i]ndependent risk-oversight professionals" that "monitor[ed] trade activity and risk profiles daily."

10.    These extensive risk control measures were overseen and enforced by the Allianz Global Investors defendants, and AllianzGI's parent, Allianz SE.  For example, the lead portfolio

manager for the Structured Alpha Funds, Greg Tournant ("Tournant"), told investors that AllianzGI's supposedly rigorous and conservative management of the Alpha Funds was enforced and backstopped by the global business comprised of the Allianz Global Investors and its parent, Allianz SE.  As he explained, "Allianz as a parent company is also monitoring" AllianzGI's management of the Alpha Funds.  Tournant told investors that "I have behind me one of the largest and most conservative insurance companies in the world monitoring every position that I take to make sure that from a legal, compliance, and risk standpoint that I'm well within guidelines,"  and according to Tournant, Allianz SE was a "master cop" that closely monitored the Structured Alpha Funds' "every position."

11.     Under that oversight, Allianz told investors that it had prepared the Funds for "highly unlikely 'what if' scenarios" by "developing mathematically pre-established portfolio actions in the event of a major statistical disruption" through continual, "[r]igorous scenario testing."  Indeed, at the end of 2019, AllianzGI told investors that it was "as prepared as ever in the event of a severe market dislocation."  Referring to a "violent correction and volatility surge" that had occurred in February 2018, AllianzGI said that "Structured Alpha's option portfolio is positioned for a strong improvement in the event of another February 2018-type move."  Unfortunately for Carpenters Trusts and other Alpha Fund investors, this was clearly not the case as the Funds began incurring losses just seven weeks later in February 2020.  Had AllianzGI actually run and adhered to the stress test protocols that it was required to follow, the Funds' exposure to the market conditions in February and March 2020 would have been readily apparent, and their losses averted.

12.     Instead, Allianz violated the Funds' core investment mandate, triggering losses during February 2020, with Alpha 250 down 13% for February 2020 and underperforming its

benchmark by nearly 5%, the Alpha 500 down by more 10%, and the Alpha 1000 Plus down over 23%. The Alpha Funds' underperformance relative to these benchmarks is highly significant because the investment mandate called for AllianzGI to use the "alpha" component of the Funds' portfolios to outperform those benchmarks irrespective of dislocations in the equities markets. AllianzGI could have taken protective actions following the February market decline by exiting the options positions that would have generated further losses if the equity markets declined or volatility increased. However, those measures would have realized the losses that began to be incurred in February. But because incurring those losses would have made it extremely difficult for the Alpha Funds to ever re-achieve returns above their respective index benchmarks—which AllianzGI needed to obtain before it could receive any future fees for managing the Alpha Funds— AllianzGI acted in its own self-interest and further breached its obligations by positioning the Funds in a manner contrary to their investment mandate and which exposed investors to extreme risk.

13.     Specifically, in February 2020, as investor concerns over the impact of the coronavirus began reverberating through the markets, AllianzGI positioned the Alpha Funds such that they were indisputably "short" volatility—meaning that the Alpha Funds would suffer losses if market volatility increased—and exposed the Alpha Funds to catastrophic losses in the event of a market downturn. Many investors, recognizing the risk that current economic and market conditions would cause volatility to increase, sought to *buy* protection against volatility. The pricing of volatility protection reflected the consensus among investors that volatility would increase significantly in the short-term. That demand for volatility protection caused the premiums associated with *selling* volatility protection to increase. The increase in the premiums associated with selling protection against volatility allowed AllianzGI to sell options to other investors at

6

increased premiums, which AllianzGI apparently believed could help "recoup" losses suffered by the Funds in February 2020—but which would dramatically increase losses if volatility continued to increase. This strategy conflicted with the Alpha Funds' stated mandate, and AllianzGI's duty to Carpenters Trusts, of maintaining market neutrality. It similarly represented a severe breach of the express fiduciary duties AllianzGI owed to the Trusts.

14.     In addition to positioning the Funds' portfolios so that they were in no way "market neutral" by the end of February 2020, Allianz also lacked any meaningful hedging positions whatsoever—the positions that were supposed to be the cornerstone of its risk management strategy. This is because, by the end of February 2020, the hedging positions that were ostensibly intended to protect the Funds against a market downturn would only begin to take effect (and generate returns to provide "protection" to the portfolios) after the Funds had already lost 30-40% of their value. In fact, many of the "hedging" put options in the Funds' portfolios were quoted in the market with no bids and an "ask" of $0.05, reflecting investors' view and the reality that these supposed positions were virtually worthless.

15.     As a result, the Alpha Funds were effectively "naked" short volatility—without any downside protection whatsoever—and betting volatility would subside at the very time volatility was rapidly increasing. Specifically, while the Chicago Board of Exchange ("CBOE") Volatility Index ("VIX") was swiftly rising, AllianzGI made a risky attempt to profit by selling volatility protection to investors.[1] These positions would generate positive results if volatility decreased. In

---

[1] The VIX is a measure of expected market volatility derived from the prices of options on the S&P 500 Index. Options and futures are available on the VIX, as well as exchange-traded notes such as the VXX. These contracts are designed to track short-term volatility movements. The Funds had sold short VXX call options, which positions would only appreciate as volatility declined.

other words, AllianzGI was effectively selling expensive insurance to other investors seeking to protect themselves from large market swings. This strategy—undertaken with the assets of Carpenters Trusts in the Alpha Funds—was a gamble that the expected market tsunami would turn out to be a drizzle. As of February 29, 2020, the Alpha 250, Alpha 500 and Alpha 1000 Plus were almost exclusively short naked VIX-traded calls. Critically, when viewed in terms of AllianzGI's investment mandate to provide downside protection and employ a strategy to outperform benchmarks regardless of the direction of equity prices, AllianzGI's decision to bet against volatility exposed the Alpha Funds to significant losses in the very scenario the Alpha Funds should have been protected against.

16.     In March 2020, as Allianz economists had predicted, investor uncertainty concerning the economic impact of the coronavirus triggered substantial (but hardly unprecedented) market volatility and prompted sharp declines in equity prices—and the Alpha Funds began to suffer extraordinary losses resulting from the volatility protection they had sold to other investors. By mid-March 2020, in apparent effort to avoid scrutiny, Allianz went "dark" and stopped communicating with investors regarding the Structured Alpha Funds' performance. And, rather than take measures to stem those losses, Allianz continued to "double down" on its bet against volatility in a self-interested move to save Allianz's own management fees. Specifically, the Funds' fee structure (described further below) would have made it impossible for Allianz to earn any fees for its management of the Funds for the foreseeable future if the losses experienced in February were not recovered by the end of March. Faced with these realities and motivated by self-interest, the Allianz Defendants risked client assets to recover these short-term losses—but only exacerbated the losses they had already caused the Funds to incur.

17.     Seeing the losses mount in the Alpha Funds portfolios' volatility-based positions during March 2020, AllianzGI's desperation led it to manipulate the settlement price of VIX futures on March 18, 2020 in an effort to mitigate the losses the Funds were poised to incur on the settlement price of VIX futures contracts expiring that day.

18.     But by the end of March, first quarter 2020 returns for the Alpha Funds had suffered catastrophic losses and severely underperformed returns for the benchmark indexes.  Specifically, first quarter 2020 returns were -49.36% for Alpha 250 compared to -19.60% for the S&P 500, and -45.13% for the Alpha 500 and -90.81% for Alpha 1000 Plus compared to 0.57% for the BofA 3-Month Index.  The Alpha Funds also significantly underperformed compared to funds with comparable investments strategies in this period, demonstrating that these losses were the result of mismanagement by AllianzGI rather than general market conditions.  On March 25, 2020, AllianzGI announced that it was liquidating the Alpha 1000 Plus (and its companion fund AllianzGI Structured Alpha 1000) because of insurmountable losses.  Analysts and insurers quickly began to downgrade AllianzGI's Alpha Funds as a result of AllianzGI's imprudence and disastrous risk management during the downturn.

19.     In a March 25, 2020 analysis of AllianzGI's mismanagement of the Alpha Funds, Carpenters Trusts' investment consultant, Callan, recommended that its clients terminate their investment in the Alpha Funds "due to the outsized magnitude of realized losses incurred year-to-date 2020, heightened risk related to the ongoing viability of the Structured Alpha platform business due to losses and incentive fee model, and the lack of formal communication from AllianzGI during the recent periods of uncertainty which exacerbates uncertainty regarding the portfolios going forward."

20.     As a result of AllianzGI's breaches, between January 1, 2020 and March 31, 2020, Carpenters Trust lost at least $261 million on its investments in the Alpha Funds.  On April 7, 2020, Carpenters Trusts filed notices of redemption to withdraw all of their remaining investments from Alpha 250 and Alpha 500 on the next redemption date, April 30, 2020.

21.     Through this action, Carpenters Trusts seeks to recover the damages caused by AllianzGI's negligence and breaches of its contractual and fiduciary duties.

## II.   PARTIES AND OTHER ENTITIES

### A.   Carpenters Trusts of Western Washington

22.     Carpenters Trusts of Western Washington is a collection of Taft-Hartley trust funds, described below, created to administer benefits to union employees and their families in Washington, Idaho, Montana, and Wyoming.  The Carpenters Trusts are managed by Boards of Trustees, and each of their members resides in the state of Washington.

23.     Carpenters Health and Security Trust of Western Washington is a Taft-Hartley trust fund (the "Health and Security Trust") established to provide and maintain hospital, medical, dental, vision, disability and similar benefits to employees and their beneficiaries.  It maintains its principal place of business in Seattle, King County, Washington.  The Health and Security Trust holds the assets of the Carpenters Health and Security Plan of Western Washington (the "Health and Security Plan"), an employee benefit plan under ERISA § 3(3).  Carpenters Health and Security Trust of Western Washington invested assets in the Alpha 500.

24.     Group Investment Trust of the Carpenters Individual Account Pension Trust of Western Washington and Carpenters Retirement Trust of Western Washington (the "Group Trust") is a group investment trust intended to comingle and diversify the assets of two Taft-Hartley trust funds, the Carpenters Individual Account Pension Trust of Western Washington (the "Pension Trust") and the Carpenters Retirement Trust of Western Washington (the "Retirement Trust").  It

maintains its principal place of business in Seattle, King County, Washington.  The Pension Trust holds the assets of the Carpenters Individual Account Pension Plan of Western Washington (the "Pension Plan"), an employee benefit plan under ERISA § 3(3).  The Retirement Trust holds the assets of the Carpenters Retirement Plan of Western Washington (the "Retirement Plan"), an employee benefit plan under ERISA § 3(3).  The Group Trust invested assets in Alpha 250 and Alpha 1000 Plus.  The Health and Security Trust, the Group Trust, the Pension Trust, and the Retirement Trust are sometimes referred to herein as the "Trusts," and the Health and Security Plan, the Pension Plan, and the Retirement Plan are sometimes referred to herein as the "Plans."

25.     Plaintiffs, the respective Boards of Trustees of each of the Trusts and the Plans, are named fiduciaries of their respective Plans under ERISA § 402(a)(2) (29 U.S.C. § 1102(a)(2)), and vested with the authority to prosecute this action on behalf of the Trusts and the Plans.  Each member of the respective Boards of Trustees resides in Washington.

**B.     Defendants**

26.     Defendant Allianz Global Investors U.S. LLC ("AllianzGI") is a Delaware limited liability company and registered investment adviser with its principal place of business at 1633 Broadway, New York, New York.  AllianzGI is a direct, wholly-owned subsidiary of Allianz Global Investors U.S. Holdings LLC (defined below).  AllianzGI is the investment manager for the Alpha Funds.  Beginning in 2014, AllianzGI became a fiduciary investment manager under ERISA §§ 3(21)(A), 3(38) (29 U.S.C. §§ 1002(21)(A), 1002(38)) for Carpenters Trusts' investments in the Alpha Funds.

27.     Defendant Allianz Global Investors U.S. Holdings LLC ("AllianzGI Holdings") is a Delaware limited liability company with its principal place of business at 1633 Broadway, New York, New York.  AllianzGI Holdings is the direct, 100% owner and sole member of AllianzGI.

11

28.     Defendant Allianz Asset Management of America L.P. ("AAMA LP") is a Delaware limited partnership with its principal place of business in Newport Beach, California. AAMA LP is the direct, 100% owner and sole member of AllianzGI Holdings.

29.     Defendant Allianz Asset Management of America LLC ("AAMA LLC") is the sole general partner of AAMA LP and is a Delaware limited partnership with its principal place of business in Newport Beach, California.

30.     Defendant PFP Holdings Inc. ("PFP"), a limited partner of AAMA LP, is incorporated in Delaware and has its principal place of business in Petaluma, California.

31.     Defendant Allianz Asset Management of America Holdings Inc. ("AAMA Holdings") is a Delaware corporation with its principal place of business in Newport Beach, California. AAMA Holdings holds a 0.1% managing interest in AAMA LLC.

32.     Defendants AllianzGI, AllianzGI Holdings, AAMA LP, AAMA LLC, PFP, and AAMA Holdings are part of what the Allianz Defendants branded the "Allianz Global Investors"— Allianz Group's global asset management business—and are sometimes referred to collectively herein as the "AGI Defendants."

33.     Defendant Allianz of America Inc. ("Allianz of America") is a Delaware corporation with its principal place of business in Petaluma, California that holds a 99.8% non-managing interest in AAMA LLC. Allianz of America is a wholly-owned indirect subsidiary of Allianz SE.

34.     Defendant Allianz Asset Management GmbH ("AAM GmbH") is incorporated and headquartered in Munich, Germany and is the asset management division of Allianz SE. AAM GmbH is the direct, 100% owner of AAMA Holdings and holds a 0.1% non-managing interest in AAMA LLC. In 2019, Allianz SE reported €7.164 billion in operating revenue from the Allianz

Asset Management business organized under AAM GmbH, substantially including revenues derived from AAM GmbH's activities and interests in managing the Alpha Funds through the operation of Allianz Global Investors, which AAM GmbH controlled at all times relevant hereto. Given AAM GmbH's control and management of Allianz Global Investors, AAM GmbH was responsible for the sale, marketing, operation, and risk management of the Alpha Funds sold to Carpenters Trusts.

35.     Defendant Allianz SE is a multinational insurance and financial services holding company incorporated and headquartered in Germany that provides asset management services to 100 million clients in over 70 countries. Allianz SE refers to itself and its subsidiaries as the "Allianz Group." Allianz SE holds a direct ownership interest of at least 75% in AAM GmbH and an indirect, 100% interest in Allianz of America. According to the Allianz SE Statutes, or articles of incorporation, Allianz SE's "corporate purpose" is "the direction of an international group of companies, which is active in the areas of insurance, banking, asset management, and other financial, consulting, and similar services." Allianz SE, through its control over Allianz Global Investors, engaged in substantial management and business activities associated with the sale, distribution, supervision and risk management of the Alpha Funds, as marketed and sold to Carpenters Trusts.

36.     A chart reflecting the citizenship and corporate relationships among the Allianz Defendants is attached hereto as Appendix A.

37.     The personnel and operational overlap of the above Allianz Defendants establishes a principal-agency relationship between each entity and AllianzGI, which is also evidenced by their shared ownership, shared directors and officers, and a unilateral reporting structure. For example, AllianzGI's sole and direct corporate parent, AllianzGI Holdings, shares numerous

overlapping directors and executives, as well as the same business address and phone number with AllianzGI. Specifically, Gemesh Pushpaharan is both the COO and Managing Director of AllianzGI and a member of the Executive Committee of AllianzGI Holdings. Paul Koo is both the Chief Compliance Officer of AllianzGI and a director of AllianzGI Holdings. As such, Mr. Koo executed AllianzGI's Forms 13G filed with the SEC on behalf of both AllianzGI and AllianzGI Holdings.

38.     Further, numerous individuals held director or managing director positions at both AllianzGI and AllianzGI Holdings: Barbara Claussen, John Carroll, David Jobson, Erin Bengtson-Olivieri, Christopher Cieri, Joseph Quirk, Steven Ricci, Frank Garofalo, Bruce Goodman, David Hood, Douglas Forsyth, Peter Bonanno, and Joseph Scull.

39.     Further establishing the chain of control among these entities, AllianzGI, AllianzGI Holdings, AAMA LP, AAMA LLC, AAMA Holdings, and PFP, under current and prior entity names, have had shared directors and officers, including:

- John Maney: COO and Managing Director of AAMA LP and AAMA LLC, and Managing Director of AllianzGI.
- James Funaro: Senior Vice President of AllianzGI, AAMA LP, AAMA LLC, AAMA Holdings, and AllianzGI Holdings, and SVP of Tax Matters for PFP.
- Tony Burg: Senior Vice President and Treasurer of AllianzGI, AAMA LLC, AAMA LP, AAMA Holdings, and AllianzGI Holdings.
- Kellie Davidson: Secretary of AllianzGI, AAMA LLC and AAMA LP; Assistant Secretary of AAMA Holdings, and AllianzGI Holdings.
- Tucker Fitzpatrick: Senior Vice President and Secretary of AAMA Holdings; Senior Vice President and General Counsel of AAMA LP, Assistant Secretary of AllianzGI Holdings and AllianzGI.
- Michael Puntoriero: CFO of AAMA Holdings and AllianzGI Holdings; Managing Director and CFO of AllianzGI, AAMA LLC, AAMA LP and PFP.
- Vinh Nguyen: Senior Vice President and Treasurer of AllianzGI, AAMA LLC, AAMA LP, AAMA Holdings, and PFP.
- Colleen Martin: SVP and Controller of AllianzGI, AAMA LLC, AAMA LP, AAMA Holdings, and PFP.

- John Viggiano:  Managing Director and U.S. General Counsel with Allianz Global Investors, and who previously served as Chief Risk Officer, Head of Compliance and Regulatory Counsel for AAM GmbH.

40.    The positions held by these individuals in various subsidiaries within Allianz Group, including AllianzGI, are summarized in the chart below:

|  | **AllianzGI** | **AllianzGI Holdings** | **AAMA LP** | **AAMA LLC** | **AAMA Holdings** | **PFP Holdings** | **AAM GmbH** |
|---|---|---|---|---|---|---|---|
| John Maney | X |  | X | X |  |  |  |
| James Funaro | X | X | X | X | X | X |  |
| Tony Burg | X | X | X | X | X |  |  |
| Kellie Davidson | X | X | X | X | X |  |  |
| Tucker Fitzpatrick | X | X | X |  | X |  |  |
| Michael Puntoriero | X | X | X | X | X | X |  |
| Vinh Nguyen | X |  | X | X | X | X |  |
| Colleen Martin | X |  | X | X | X | X |  |
| John Viggiano | X |  |  |  |  |  | X |

41.    These overlapping relationships among the Allianz Defendants' employees, officers and directors are consistent with Allianz Global Investors' branding and representations to Carpenters Trusts.  Indeed, Allianz SE's corporate filings also illustrate the important role the ultimate parent company—Allianz SE—plays in establishing and enforcing the risk framework and procedures that failed in the case of the Alpha Funds.  For example, Allianz SE's Board of Directors is charged with "setting business objectives and the strategic direction, for coordinating and supervising the operating entities, and for implementing and overseeing an efficient risk management system," including "risk controlling processes" set by the Board that required "regular reporting to [Allianz] Group."  Board members of both Allianz SE and the Allianz Group

sat on a "Group Investment Committee" responsible for "implementing the Group investment strategy, including monitoring group-wide investment activities" and "approving investment-related frameworks and guidelines[.]"   According to those filings, Allianz Group runs its "operating entities"—including the Defendant subsidiaries here that comprise its asset management division—"via an integrated management and control process," which includes Allianz Group's reviewing the operating entities' "business strategies and goals."  And as the lead portfolio manager for the Alpha Funds explained to Alpha Fund investors, Allianz SE was a "master cop" that was "monitoring every position that I take to make sure that from a legal, compliance, and risk standpoint that I'm well within guidelines."

42.     Allianz SE acknowledges that it exercises controlling power over each of the other Allianz Defendants and relies on their business activities in assessing its own solvency under applicable European insurance regulations.   Specifically, according to Allianz Group's 2019 Solvency and Financial Condition Report, Allianz SE exercises a "dominant" influence over, has 100% voting rights in and capital share with, and uses 100% of the financials for the establishment of Allianz Group's consolidated accounts and solvency calculation of each of Defendants AllianzGI, AllianzGI Holdings, AAMA LP, PFP, AAMA LLC, AAMA Holdings, and AAM GmbH—confirming the ultimate control Allianz SE exerts over the AGI Defendants.

## III.     JURISDICTION AND VENUE

43.     This Court has jurisdiction over the causes of action asserted in this Complaint pursuant to 28 U.S.C. § 1331 as the claims arise under the laws of the United States, and pursuant to 28 U.S.C. § 1367 insofar as all other claims are so related to the claims that arise under the laws of the United States that they form part of the same case or controversy.

44.     This Court also has jurisdiction under ERISA § 502(e)(1) (29 U.S.C. § 1132(e)(1)).

45.     This Court also has jurisdiction over the causes of action asserted in this Complaint pursuant to 28 U.S.C. § 1332(a)(3) (diversity of citizenship) because the dispute is between a citizen of Washington and citizens of different U.S. states and of Germany, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

46.     Venue is proper in this District pursuant to ERISA § 502(e)(2) (29 U.S.C. § 1132(e)(2)).

47.     Venue also is proper pursuant to 28 U.S.C. § 1391(b)(2) because under the Agreements, the parties consented to submit to the jurisdiction of the United States District Court for the Southern District of New York "in the event of any dispute arising out of the terms and conditions" of the agreements governing Carpenters Trusts' investments in the Alpha Funds.  In addition, actions that AllianzGI and the other Allianz Defendants undertook in managing the Alpha Funds occurred in the New York, New York headquarters of AllianzGI, in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     Background of the Allianz Global Investors Enterprise

48.     Allianz solicited investments in the Alpha Funds based on the proclaimed ability to provide attractive investment opportunities and consistent returns protected by Allianz SE's purportedly sophisticated risk management.   Branded as "Allianz Global Investors"—the marketing name for the Allianz Group's global asset management business—Allianz presented itself as a single unitary enterprise, under the leadership of its corporate holding parent Defendant Allianz SE, that operated on a coordinated basis throughout the world.

49.     As explained in marketing materials on its website and presented to Carpenters Trusts, Allianz Global Investors repeatedly highlighted the benefits of its relationship with Allianz SE, its reputation for superior risk management, and its track record.

50.     Similarly, as noted above, Tournant told Alpha Funds investors that AllianzGI would never "swing for the fences" with the Alpha Funds because he and AllianzGI had Allianz SE as a "master cop" "monitoring every position that I take to make sure that from a legal, compliance, and risk standpoint that I'm well within guidelines." Allianz Global Investors claimed that its "ability to manage risk for investors is a direct reflection of our own business" at AllianzGI's parent company—Allianz SE—"where we practice the highest standards of enterprise risk management." Similarly, Allianz Global Investors touted in marketing materials that it is a "globally integrated investment manager" that "has a strong parent with a track record of strategic investment for the long term."

51.     Further reinforcing the notion that investors could rely on the "rock-solid risk management" and benefits of that global enterprise, Allianz Global Investors presented its investment performance and assets under management in marketing materials as the combined activities of the Allianz Defendants named herein. Allianz Global Investors defined itself as a group of entities that "coordinate[s] their research, investment and/or trading activities" qualifying as a "firm" under the Global Investment Performance Standards ("GIPS"), a set of international standards governing the disclosure and representation of investment performance results. Doing so enabled Allianz Global Investors to advertise to investors that they would benefit from the strength and stability of over 760 investment professionals in 25 offices worldwide and management of over USD 604 billion in assets. As explained in marketing materials, Allianz Global Investors' "global investment platform brings together professionals from across asset classes and investment styles, enabling them to collaborate to generate unique insights for clients while maintaining distinct investment processes."

52.     The ability to draw from the experience, risk management expertise, and asset base of the global Allianz Global Investment platform and Allianz SE was a core feature of the Alpha Funds investment proposition.   In fact, Deborah Zurkow ("Zurkow"), the Global Head of Investments at Allianz Global Investors, said one of the benefits of investing in liquid alternatives (like the Alpha Funds) through Allianz was that Allianz Global Investors' broad scale and asset base provided protection during times of financial turmoil.   As Zurkow explained, Allianz Global Investors has "an entrepreneurial culture that sits inside a stable parent"—a particularly "important" feature in alternatives given "investors' concern that the smaller hedge funds or alternatives teams won't be able to maintain the kind of counter-party liquidity required if we hit a crisis."   By suggesting that Allianz Global Investors, and its ultimate parent, Allianz SE, would step in to support the Funds in the event of "counter-party" illiquidity, the Allianz Defendants sought to market the Funds not only based on the skills and resources of Allianz Global Investors but more specifically based on the capital and liquidity support the Allianz Defendants could collectively provide.

53.     Tracking these representations, AllianzGI's SEC filings state that AllianzGI coordinates its activities with the Allianz Global Investors affiliates, each of which is also a directly or indirectly wholly-owned subsidiary of Allianz SE.   For example, those filings explain that AllianzGI shares employees with and provides other services to the Allianz Global Investors affiliates (including the AGI Defendants) and similarly receives services in return, including in legal and compliance, risk management, human resources, finance, information technology, trade support, and sales and marketing.   In addition, AAMA LP, the direct parent company and 100% owner of AllianzGI Holdings (the direct parent of AllianzGI), provides technology, business systems, human resources, legal, and finance to AllianzGI.   Similarly, AAMA LLC, the sole

general partner of AAMA LP, shares a business address and phone number with AAMA LP. Employees, directors and officers of AllianzGI, AllianzGI Holdings, AAMA LP, and AAMA LLC are subject to discipline under a common Code of Business Conduct and Code of Ethics.

54.     In fact, rather than being a mere marketing name, Allianz Global Investors has its own "Global Executive Committee," "Global Investment Management Committee," and "executive leadership team" that manages and oversees the activities of the Allianz Global Investors entities.  Those executives include Global Chief Executive Officer ("CEO") Tobias Pross ("Pross"), Global Chief Operating Officer ("COO") Karen Prooth, Zurkow, and Global Head of Products, Operations and Technology Alexandra Auer, who was recently promoted from her position as COO of Defendant AAM GmbH.

55.     The actual management and oversight of the Alpha Funds, as well as the interrelationships between the related AGI Defendants here, followed the unified "global entity" that Allianz presented to investors.  The portfolio managers responsible for the Alpha Funds— Greg Tournant, Stephen G. Bond-Nelson, and Trevor L. Taylor—are Managing Directors at AllianzGI.  Tournant, in turn, reports to Zurkow, Global Head of Investments at Allianz Global Investors, who is employed by Allianz Global Investors GmbH, UK Branch, an affiliate of AllianzGI.  Zurkow is specifically identified as an "associated person" of AllianzGI under the Investment Adviser Act of 1940 in AllianzGI's Form ADV filing.  Chris Grix, Allianz Global Investors' U.S. Head of Risk, who reports to Wolfram Peters, Allianz Global Investors' Global Head of Risk, were both involved in overseeing the Alpha Funds performance in February and March 2020.  And John Viggiano, Managing Director and U.S. General Counsel at Allianz Global Investors, who also served as Chief Risk Officer, Head of Compliance and Regulatory Counsel for

Defendant AAM GmbH, later communicated with Carpenters Trusts about the Funds' performance during this time period.

56.     Following the disastrous performance of the Alpha Funds in February and March of 2020, Allianz Global Investors announced that Douglas Eu ("Eu"), CEO of AllianzGI and a key official responsible for oversight of the Alpha Funds, would be leaving the firm on June 30, 2020, after 14 years with Allianz, including as the U.S. CEO of Allianz Global Investors GmbH.  In connection with Eu's departure, Allianz installed Malie Conway, moving her from her role as Chief Investment Officer of Global Fixed Income Strategies in London to be the head of Allianz Global Investors' U.S. distribution operations in New York.  She will report to Pross, in Frankfurt, Germany.  Allianz disclosed that it will not appoint a new AllianzGI CEO to replace Eu.

**B.      AllianzGI's Duties to Carpenters Trusts and the Alpha Funds Mandate**

57.     AllianzGI—the investment manager for the Alpha Funds—acted as a fiduciary to Carpenters Trusts in managing Carpenters Trusts' investments in the Alpha Funds.  The Alpha Funds were governed by several documents, the most recent documents for the Alpha 1000 Plus being the Third Amended and Restated Limited Liability Company Agreement Of AllianzGI Structured Alpha 1000 Plus LLC dated April 1, 2017 ("Alpha 1000 Plus LLC Agreement"), AllianzGI Structured Alpha 1000 Plus LLC Confidential Private Placement Memorandum ("Alpha 1000 Plus PPM"), and the AllianzGI Structured Alpha 1000 Plus LLC Subscription Agreement dated March 25, 2014 ("Alpha 1000 Plus Subscription Agreement") and Side Letter Agreements dated March 25, 2014, April 1, 2014, and June 11, 2014 (the "Alpha 1000 Plus Side Letters").

58.     The Alpha 1000 Plus LLC Agreement, Alpha 1000 Plus PPM, Alpha 1000 Plus Subscription Agreement, and Alpha 1000 Plus Side Letters (collectively, the "Alpha 1000 Plus Agreements") are substantively similar in all material aspects to the corollary relevant provisions found in the documents for the Alpha 250 and Alpha 500 (collectively, the "Agreements").  The

Agreements include the AllianzGI Structured Alpha U.S. Equity 250 LLC Agreement and the AllianzGI Structured Alpha 500 LLC Agreement (collectively, with the Alpha 1000 Plus LLC Agreement, the "LLC Agreements"), the AllianzGI Structured Alpha U.S. Equity 250 Confidential Private Placement Memorandum and the AllianzGI Structured Alpha 500 Confidential Private Placement Memorandum (collectively, with the Alpha 1000 Plus PPM, the "PPMs"), the AllianzGI Structured Alpha U.S. Equity 250 Subscription Agreement and the AllianzGI Structured Alpha 500 Subscription Agreement (collectively, with the Alpha 1000 Plus Subscription Agreement, the "Subscription Agreements), and two Side Letter Agreements dated March 10, 2015 (the "Alpha 500 Side Letter") and August 23, 2016 (the "Alpha 250 Side Letter", and collectively, with the Alpha 500 Side Letter and the Alpha 1000 Plus Side Letters, the "Side Letters").

59.     AllianzGI is the Managing Member of the Alpha Funds and is responsible for the general management of the Alpha Funds, with a focus on active management.  AllianzGI expressly acknowledged that it served as a fiduciary for Carpenters Trusts in the Agreements.  In the LLC Agreements, AllianzGI agreed that "to the extent that the underlying assets of the Company constitute 'plan assets' within the meaning of ERISA . . . [AllianzGI], in its capacity as 'investment manager' of the Company . . . shall at all times discharge its duties consistent with the standard of care imposed on fiduciaries under ERISA and/or Section 4975 of the [Internal Revenue] Code."  AllianzGI also agreed in the PPMs that "for so long as the assets of the Fund are treated as 'plan assets' for purposes of ERISA, [AllianzGI] is a 'fiduciary,' as such term is defined by ERISA."

60.     AllianzGI also agreed to act as a fiduciary even if there were not "plan assets" in the Alpha Funds.  In the LLC Agreements, AllianzGI agreed "[t]o the extent that the underlying assets of the Company do not constitute Plan Assets [under ERISA], Allianz Global Investors U.S. LLC . . . shall at all times use its reasonable best efforts to discharge its duties consistent with the

22

standard of care imposed on fiduciaries under Section 404(a)(1)(B) of ERISA." AllianzGI also stated in the PPMs that "[d]uring any such time that the assets of the Fund are not treated as 'plan assets' for purposes of ERISA . . . the Managing Member nevertheless will use its reasonable best efforts to discharge its duties consistent with the standard of care imposed on plan fiduciaries under Section 404(a)(1)(B) of ERISA."

61.    In the Side Letters, AllianzGI reiterated its status as a fiduciary. AllianzGI acknowledged in the Side Letters that "[t]he Managing Member[,]" AllianzGI,

> hereby confirms that notwithstanding anything in the LLC Agreement, the PPM and the Subscription Agreement, as a registered investment adviser under the Investment Advisers Act of 1940 granted discretionary investment authority over the assets of the Fund, during any time or times in which the assets of the Fund are deemed to be 'plan assets' for purposes of ERISA, the Managing Member (and any other person having or exercising discretionary authority over the Fund or its assets) shall (i) be considered for all purposes a 'fiduciary' as defined by Section 3(21) of ERISA, an 'investment manager' as defined by Section 3(38) of ERISA

and will "discharge its duties with respect to such assets in accordance with ERISA, including without limitation, the ERISA fiduciary standard of care[.]" The Side Letters also state that "[d]uring any such time that the assets of the Fund are not treated as 'plan assets' for purposes of ERISA, the Managing Member nevertheless will use its best efforts to discharge its duties consistent with the standard of care imposed on plan fiduciaries under Section 404(a)(1)(B) of ERISA."

62.    AllianzGI purported to operate the Alpha Funds with a specific investment objective: to outperform each Alpha Fund's respective benchmark index by a certain number of basis points, or one hundredth of one percent. AllianzGI and Allianz Global Investors intended to achieve the investment objectives of the Alpha Funds through active management of an options overlay strategy. Specifically, Alpha 1000 Plus's investment objective was to outperform the BofA Merrill Lynch 3-Month U.S. Treasury Bill Index (the "BofA 3-Month Index") by approximately

14% to 16%, gross of fees and expenses. Reducing the net return to investors by Alpha 1000 Plus's incentive allocation and expenses, AllianzGI expected to outperform the BofA 3-Month Index by approximately 10%.

63.     In its effort to achieve these objectives, AllianzGI represented that the Alpha 1000 Plus invested in both "beta" and "alpha" options components. The "beta" component was purportedly 100% invested in U.S. treasury bills in order to achieve the strategy's "benchmark" exposure.

64.     The options "alpha" component for the Alpha 1000 Plus was designed to generate "[a]bsolute return in any environment" with the "ability to benefit from high volatility." The alpha component specifically consisted of investments in puts and calls on major equity indexes such as the S&P 500 Index as well as options directly on the VIX using a proprietary model to construct the option spreads. The alpha component purportedly employed a diversified options overlay strategy using three core trades, as described further below. Allianz explained that the "plus" of Alpha 1000 Plus was a reference to the options component and that it provided resilience through an inverse correlation to the equities market, with the expectation that over time, correlation to equities would be "zero."

65.     Alpha 500's investment objective was to outperform the BofA 3-Month Index by approximately 750 basis points, or 7.5% gross of fees and expenses. Reducing the net return to investors by the incentive allocation and expenses for Alpha 500, AllianzGI expected to outperform the BofA 3-Month Index by approximately 5%.

66.     Like the Alpha 1000 Plus, the Alpha 500 consisted of both an alpha component and a beta component. The beta component was invested in various investment assets intended to deliver a return equivalent to the BofA 3-Month Index.

67.    The alpha component of the Alpha 500, like the alpha options component of Alpha 1000 Plus, used the same "proprietary model" and three core trades described below to generate returns.

68.    Alpha 250's investment objective was to outperform the Standard and Poor's 500 Composite Stock Index (the "S&P 500") by approximately 375 basis points, or 3.75%, gross of fees and expenses.  Reducing the net return to investors by the incentive allocation and expenses for Alpha 250, AllianzGI expected to outperform the S&P 500 by approximately 2.5%.

69.    Like the Alpha 1000 Plus and Alpha 500, the Alpha 250 consisted of both an alpha component and a beta component.  The beta component consisted of a futures trading program, cash investments, ETFs, equity swaps or securities to achieve broad exposure to the S&P 500 and was primarily comprised of investments in the iShares Core S&P 500 ETF known by ticker symbol "IVV," which tracks the S&P 500 Index.  The alpha component of the Alpha 250, like the options alpha component of Alpha 1000 Plus and Alpha 500, used the "proprietary" options trading model.

70.    Further, because 100% of the assets are always invested in the beta portfolio, Carpenters Trusts' investments in all three Alpha Funds supposedly were protected and not significantly riskier than an investment in securities tracking the BofA 3-Month Index or the S&P 500.

71.    Through the Funds' alpha components, the Alpha Funds were purportedly structured to be "uncorrelated" with the "direction of equities and volatility," *i.e.*, market-neutral; "protect[ed] against a market crash, hedging against extreme downside market moves"; and subject to significant risk management through a "daily optimisation process," monitoring equity index behavior and bid-ask spreads, scenario and stress testing, and firm-level independent oversight by Allianz Global Investors.  In sum, AllianzGI's option overlay strategy purportedly aimed to capture

volatility premiums and deliver consistent absolute returns that were not dependent on the direction of equity markets, while also offering tail risk protection against large market declines and changes in volatility.

72.     AllianzGI's head portfolio manager, Tournant, described AllianzGI's options strategy as akin to selling insurance, where a premium is paid for the rights provided by the option and a premium is collected to provide that right.   While the strategy would earn a net premium from selling both put and call options, the portfolio was stated to always hold more long put option contracts relative to the number of put options sold.   By doing so, AllianzGI purportedly protected against downside exposure in a tail risk event or significant market decline, as AllianzGI would be able to exercise or sell those positions in a declining price environment.   Specifically, as Allianz told investors, the strategy's long-to-short put ratio meant that under no scenario could a large equity decline result in a margin call, which was a supposedly crucial distinguishing feature from other options strategies.

73.     Option values are directly affected by the expected volatility of the underlying asset.   The values of both put and call options increase as the expected volatility of the underlying asset increases.   Thus, the price of the "insurance" that AllianzGI was selling to the markets through its options trading would increase as expected market volatility increased.   When expected market volatility went up, the Funds would make money on their long positions in equity index options and lose money on short positions.[2]   Thus, when volatility was high, AllianzGI could

---

[2] The "long" side of an option position is the buyer of the option who has paid for the right but not the obligation to exercise the option.   The "short" side of the option is the seller who has sold the right and who must complete the agreed upon transaction if and only if the long side chooses to exercise.   One can think of the short side as the seller of insurance against a particular event happening (*e.g.*, the price of the underlying asset dropping), and who gets to keep the premium if the event does not happen.

potentially make more money by selling options, while the cost of the options it purchased to hedge its exposure would be higher.

74.     In executing its alpha options overlay strategy, AllianzGI implemented three types of trades through combinations of option positions that were meant to complement each other: the range-bound spread trades, the directional spread trades, and hedges.  The range-bound spread, the type of trade that historically generated two-thirds of the Alpha Funds' excess returns, included combinations of options positions that would make money if the underlying asset stayed in a particular range but would lose money if the price of the underlying asset landed outside the range.  This can be thought of as similar to selling insurance against the price of the underlying asset landing outside the range. If the market remained stable, AllianzGI could sell protection against upside or downside "tail risk"—the possibility that the market could go up or down by an extreme amount—without having to pay anything out.

75.     The directional spread strategy—which was intended to be a diversifier that provided returns when the market behaved unusually—is the opposite of the range-bound spread. In a December 2013 presentation, AllianzGI represented to Carpenters Trusts that the directional spread strategy had been responsible for one-third of the Funds' excess returns.  A directional trade is a bet that the underlying asset will move in a particular direction.  The directional spread trade would generate positive returns if asset prices moved in one direction or the other.  The Alpha Funds' strategy historically used more discretion when setting directional spread trades, aiming to take advantage of mispricing in the options market.  AllianzGI's directional spread trades, had they been in place, should have provided protection to the Funds and yielded significant returns during the volatile market conditions in February and March 2020.

76.     Finally, AllianzGI purportedly maintained a constant hedge against large equity market sell-offs by holding long, out-of-the-money puts which—AllianzGI claimed—would protect against any sudden market declines.  Critically, the primary objective of these hedging positions was to "protect the portfolio in the event of a market crash/closure."

77.     In establishing these three trading positions, AllianzGI traded in options on major equity indexes, and took positions on volatility using options on volatility products such as the VIX.  If the VIX goes up (meaning investors expect more volatility), a call option on the VIX would increase in value and a put option would lose value.  If the VIX goes down (meaning investors expect less volatility), a call option on the VIX would lose value and a put option would gain value.  AllianzGI also took short calls on exchange-traded notes such as the VXX, an option with returns based on the S&P 500 VIX Short-Term Futures Index Total Return that is essentially a derivative note built on top of the VIX.

78.     This three-part approach was to be effectively market-neutral and "agnostic to implied levels of volatility."  AllianzGI emphasized that it was "[p]ositioned for all market environments" and "able to weather different market environments due to the continual optimization of [these] three types of building blocks," which aimed to provide "consistent, uncorrelated returns regardless of the direction of equities and volatility."  Further to that point, Allianz Global Investors represented that the Funds had an "[a]bility to perform whether equity markets are up or down, smooth or volatile."

79.     AllianzGI even marketed the Alpha Funds on the basis that they would perform well in volatile markets.  In a December 2013 presentation to Carpenters Trusts, AllianzGI represented that "market conditions" that are "[v]olatile" would have a "[p]otential for higher returns" with "lower risk."

80.     In sum, reiterating the investment's core premise and tie to the unified Allianz enterprise, AllianzGI described the Structured Alpha Funds' approach to investors as a "confident strategy with an insurance spirit," saying "[t]his focus on reliable returns [was] demonstrative of Allianz's business as a whole—as both an asset manager and an insurer."  However, as noted above, and described further below, during February and March 2020—when the Funds were highly sensitive to market volatility—they were positioned contrary to the Funds' investment mandate, were short volatility during a time of extreme volatility in the markets, and lacked adequate hedging to protect against market downturns.

### C.     AllianzGI's Duties to Carpenters Trusts Included Ensuring That the Alpha Funds Were Adequately Hedged to Protect Investors Against Downside Risk

81.     AllianzGI described risk management as a core feature of the Structured Alpha investment strategy.  Specifically, AllianzGI claimed that the Alpha Funds' investment objective was to "protect against a market crash."  The Alpha Funds purportedly held long, out-of-the-money puts "embedded in the portfolio at all times," "not for outperformance potential, but a[s] a key feature of the strategy's risk management."   A long, out-of-the-money put is, essentially, catastrophe insurance that protects an investment against dramatic downward price moves in the market.

82.     Thus, AllianzGI's purported risk management process ensured that certain option positions were always in place as protection, which created a floor against significant market declines.  Allianz Global Investors product specialist Jeff Sheran reassured investors that the Alpha Funds would never be positioned to just sell volatility or downside protection without any hedges, stating, "We would never be naïve about just collect[ing] premium . . . never."

83.     AllianzGI also purported to protect against losses by employing "tail-risk protection, risk reduction, and/or volatility smoothing" based on "rigorous scenario testing."

AllianzGI represented to other investors that "stress tests are a crucial part of our portfolio management process." AllianzGI explained that its "objective" was to "ensure that the positions in the portfolio would generate an acceptable [profit and loss] outcome across a wide range of market shocks, both multi-week and one-day." For Alpha 1000 Plus, AllianzGI aimed to "minimize our option portfolio drawdown to -10% over the market dislocation period."

84.    AllianzGI also claimed that risk was continuously managed and monitored at both the portfolio level by the investment team and the firm level by an independent risk management group.

85.    At the portfolio level, AllianzGI purported to utilize real-time risk management and monitoring based on statistical equity index behavior, proprietary scenario and stress testing models, and consistent monitoring of bid-ask spreads for options to ensure execution. Structured Alpha materials stated that:

> [O]ne of the most unique characteristics of our approach is the combination of both long- and short-volatility positions at all times. The option portfolio seeks to capitalize on the return-generating features of selling options (short volatility) while simultaneously benefiting from the risk-management attributes associated with buying options (long volatility) and to continually optimize the balance between these two types of exposures.

Further, AllianzGI informed investors that in connection with the "[r]igorous scenario testing" AllianzGI purported to perform to ensure appropriate portfolio composition, a "substantial portion of the portfolio manager's time is spent analyzing highly unlikely 'what if' scenarios and developing mathematically pre-established portfolio actions in the event of a major statistical disruption."

86.    The Allianz Defendants purported to regularly evaluate portfolio and counterparty risk, business risk, operational risk, and reputational risk. AllianzGI said it engaged an external, independent risk management service provider to provide analysis and reporting services, Allianz

SE subsidiary IDS GmbH ("IDS").  Allianz claimed that IDS supported Allianz Global Investors' "Investment Analytics" function, which monitors the Alpha Funds' "daily trade activity and weekly risk profiles to check for any significant shifts in the portfolios."  That function purportedly performed extensive scenario analyses to ensure that "all portfolios' style and construction are within guidelines," with risk controls including:

- at least 31 stress tests that measured contribution to risk by index product;

- GARCH estimates of risk;[3]

- Non-Gaussian Value at Risk ("VaR") and expected shortfall;

- Delta, Gamma, and Vega analysis; and

- analysis of performance statistics (drawdowns, correlations, skewness, kurtosis, Sharpe Ratios, Cornish-Fisher VaR, and Omega).

87.    Materials provided to Alpha Fund investors outline the various layers of risk control protections at both the firm level and the portfolio level for the Alpha Funds as follows:



---

[3] Or "Generalized Autoregressive Conditional "Heteroskedasticity."  The GARCH model is a statistical model that captures features such as volatility clustering for downside risk evaluation.

88.     Tournant spoke at length in a May 2016 interview, featured on AllianzGI's website, about the risk-mitigating features purportedly inherent in AllianzGI's investment strategies for the Alpha Funds.  When asked about the risk-management strategy for the Alpha Funds, Tournant said:

> The way we construct the strategy is we have a wide range of positions.  Some positions are designed to make money if the market goes up, some will make money if the market goes down and some will make money if the market is in range bound.  They exist in the portfolio all the time so therefore our objective is never to guess the direction of the market, not be dependent on the direction of the market, and hopefully we have a statistical outcome that will allow us to generate profits regardless of market directions."

89.     Analogizing the Alpha Funds' strategies to the functioning of an insurance company that would have to pay out only when there is a "catastrophic event," Tournant continued, "I would also add the fact that given the positions that we buy to protect ourselves against those catastrophic shocks, those kinds of risk insurance positions, that you could label those as reinsurance."  That is, even if a large market downturn were to occur, Tournant explained that the Alpha Funds had "risk insurance positions" that would "***further protect [the] portfolio*** and business."

90.     Tournant reiterated the portfolio's "market neutral" strategy in an October 2015 video presentation, telling investors that the Alpha Funds were able to generate "consistent returns over the past ten years" and performed well "regardless of market conditions," as the positions were designed to generate returns whether the market was "up, flat or down."  For example, Tournant explained that prudent, active management of the portfolio enabled the Alpha Funds to "weather the [recent] storm" following a substantial "increase in market volatility" in October 2015 by being "able to manage actively our profit zone."

91.     The involvement of Allianz SE and the global Allianz Global Investors enterprise and their experienced and coordinated risk management apparatus was crucial to the Alpha Funds' investment proposition.  Tournant told investors, "I have behind me one of the largest and most

32

conservative insurance companies in the world monitoring every position that I take to make sure that from a legal, compliance, and risk standpoint that I'm well within guidelines."  Calling Allianz SE the "master cop," Tournant reassured investors that this backing meant the Alpha Funds would never "swing for the fences" through risky, bet-the-firm positions.

92.     In accordance with these assurances, in assessing a fund run by the Structured Alpha team responsible for the Alpha Funds, Morningstar analysts cited the benefits from the "broader resources at Allianz Global Investors," including the "firm's independent risk management function [which] oversees the structured alpha platform, monitoring daily trading activity."  According to Morningstar, the "team's disciplined focus on risk management—through limits on leverage, perennial crash protection through put option hedges, position diversity across expirations, and the managers' ability to adjust the risk profile during volatile markets—gives us confidence this strategy can continue to overcome such short-term setbacks" such as those that can accompany unexpected volatility spikes.  Critical to that risk management analysis was Morningstar's observation that the Structured Alpha team not only "performs a daily quantitative risk analysis, which includes a variety of stress tests" but "benefits from ***Allianz Global Investors' independent risk oversight with real-time positioning monitoring***."

93.     Contrary to Allianz's representations, however, Allianz Global Investors' "independent risk oversight" and "Investment Analytics" function was entirely ineffective. Specifically, Allianz affiliate IDS, which purportedly provided daily trade and risk analysis to support this function, was in fact incapable of accurately assessing or reporting risks on derivative securities (like the options portfolios in the Structured Alpha Funds).  Concerns over IDS's deficiencies were raised with the senior leadership of Allianz Global Investors, including Zurkow and Pross, and were a frequent topic of discussion among senior Allianz executives, including

Global Head of Investment Analytics Christian Franzen.  IDS's problems were so prominent that they had been discussed at Allianz Global Investment Committee meetings for years, and internal reports that IDS's failures posed serious regulatory and governance risks eventually led Allianz to hire a law firm to conduct an internal investigation in late 2019.  These issues were also reported to Allianz SE.  Allianz further breached its duties by failing to correct or disclose these serious deficiencies to Washington Carpenters.

### D.   AllianzGI Abandoned Needed Risk Protections Amid Widespread Evidence of an Impending Market Downturn

94.     The coronavirus began to be widely covered by major U.S. news outlets as early as January 8, 2020, with numerous reports of a developing virus that had caused dozens of people in central China to fall ill.

95.     On January 21, 2020, equity prices worldwide dropped due to fears that the coronavirus outbreak could slow global economic growth.  Specifically, the Dow Jones Industrial Average dropped 152.06 points, or 0.5%, to 29,196.04, its first decline in six sessions; the S&P 500 fell 8.83 points, or 0.3%, to 3,320.79; and the Nasdaq Composite lost 18.13 points, or 0.2%, to close at 9,370.80. That day, a man in Washington state was confirmed as the first case of coronavirus in the U.S.

96.     By January 30, 2020, the World Health Organization (the "WHO") declared the coronavirus to be a public health emergency, a declaration based—at that point—on approximately 7,700 confirmed and 12,000 suspected cases of the virus in China alone.

97.     On February 3, 2020, Mohamed El-Erian, chief economist for Allianz SE, appeared on CNBC to comment on the impact of the spread of the coronavirus.  El-Erian said, "The coronavirus is different… it is big.  It's going to paralyze China.  It's going to cascade throughout the global economy.  And, importantly, it cannot be countered…by central bank policies.  So, I

think we should pay more attention to this, and we should try and resist our inclination to buy the dip."

98.    Indeed, the VIX, which measures the market's expectations of volatility based on the S&P 500—and which increases in a market downturn—was reaching rarely seen highs of 40 at the end of February 2020 and leading into March 2020.

99.    As volatility in the market increased, however, throughout February and March 2020, AllianzGI made a series of investments that positioned the Funds' portfolio to generate returns if volatility *subsided*.  Specifically, as the market began to slide in February 2020, and the Alpha Funds began incurring losses, AllianzGI structured the Alpha Funds' portfolios to recoup those losses, taking aggressive positions that deviated from the investment strategy and abandoning the risk controls AllianzGI was required to have in place.

100.    By the end of February 2020, AllianzGI positioned the Alpha Fund portfolios to generate returns if the market stabilized and volatility levels declined.  The Alpha Funds' month-end holdings for February 2020 reveal that they had net short put positions on volatility—meaning the Alpha Funds would produce returns if the markets became ***less*** volatile—which left them severely exposed to the soaring volatility that accompanied the March 2020 market decline.

101.    Specifically, as illustrated in the chart below, as of February 29, 2020, Alpha 250 was positioned so that declines in VIX (indicating that investors were less interested in buying protection against volatility) would yield modestly positive returns, whereas any increases in VIX (investors are more interested in and paying more for protection against volatility) would cause returns to plummet—demonstrating a lack of basic risk management.

**Change in Alpha 250 Portfolio's Intrinsic Value
as a Function of Change in VIX Closing Prices Based on 2/29/2020 Holdings**



102.    Similarly, Alpha 500 portfolio's holdings as of February 29, 2020 reflect the same

vulnerability to increases in VIX.

**Change in Alpha 500 Portfolio's Intrinsic Value
as a Function of Change in VIX Closing Prices Based on 2/29/2020 Holdings**



103.    In addition, Alpha 1000 Plus's portfolio holdings as of February 29, 2020 also

reflect the same vulnerability to increases in VIX.



104.   Moreover, it appears that, as of February 29, 2020, the Alpha Funds were not even hedged against normal price changes in the S&P 500 with non-crisis-levels of volatility.

105.   As set forth in the chart below, even assuming no changes in VIX, as of February 29, 2020, Alpha 250's portfolio was structured such that a downward change in the S&P 500 would cause a significant decline in the value of the portfolio.



106.   Alpha 500's portfolio was structured so that a decline in the S&P 500, with no change in the VIX, would cause an even more drastic decline in the portfolio's value.



107.   Similarly, Alpha 1000 Plus's portfolio was structured so that a decline in the S&P 500, with no change in the VIX, would cause an even more drastic decline in the portfolio's value.



108.     In fact, a very basic "terminal value" stress test on the Alpha Funds' portfolios as of January 31, 2020 and February 29, 2020 would have revealed, to the expected dollar, outcomes for the Alpha Funds under scenarios measuring a combination of the decline in the S&P 500 and higher volatility.  Such stress test results would have made clear both the losses that would result from the Alpha Funds' positioning, and the fact that the Alpha Funds were extraordinarily exposed to a short volatility event in advance of the February and March 2020 market moves.

109.     In breach of its duties, AllianzGI positioned the Alpha Funds' portfolios in a manner that was not crash protective but, rather, the reverse—highly exposed to losses during a period of market stress.  Rather than having positions that would protect investors in the event of a market downturn, as AllianzGI was required to maintain, the Alpha Funds were not hedged against a normal market decline, much less a major drawdown amid continuing volatility.  Similarly, the Alpha Funds' positions in volatility options were positioned to *decline* in value if there was an

increase in volatility.  This was contrary to the investment mandate that the Funds be "market-neutral" and hedged against volatility and equity market declines.

110.    Instead, AllianzGI was effectively gambling that by selling an immense amount of high-premium option insurance both in S&P 500 put options and naked VIX and VXX call options, the Alpha Funds would reap substantial returns.  At the same time, the supposed "protection" provided by the put options that were in place was meaningless because those options had strike prices that were too low (and maturities that were too short-dated) to actually be useful in a market crash, as Allianz defined it.  While this positioning nominally adhered to Allianz's prior promise to "[b]uy put options—in a greater quantity than sold," this "crash protection" was effectively just cosmetic "window dressing."

111.    Unfortunately for Carpenters Trusts, the market conditions anticipated by Allianz's economists came to pass, as VIX continued to increase in March 2020 as the economic impact of the coronavirus triggered a multi-week stock market decline.

E.    **AllianzGI's Imprudent Investments and Self-Interested Mismanagement in March 2020 Locked in the Alpha Funds' Losses**

112.    Not only did AllianzGI fail to properly hedge for an ongoing market downturn in late February 2020, but AllianzGI also abandoned its investment mandate in March 2020 and positioned the Funds' portfolios in a manner that exacerbated their losses.

113.    AllianzGI tried to reverse the Alpha Funds' February 2020 losses by doubling down on its prior bet and attempted to "recoup" those losses by increasing the portfolios' spreads based on the (incredibly risky) hope that the market would not continue to decline.  AllianzGI has now admitted that in early March 2020, it embarked on this new approach, which it has referred to, ironically, as "de-risking."   In this case, "de-risking" apparently meant (a) buying back short positions in a falling market (at significant cost), (b) further shorting volatility, and (c) failing to

hedge the Funds' portfolios to protect against further losses.  This "de-risking" move was a total abandonment of the investment strategy, hedging, and risk management practices that AllianzGI had promised to Carpenters Trusts.

114.    On March 9, 2020, amid growing fears about the spreading coronavirus, the S&P 500 declined by 7% within five minutes of the opening bell.  As Allianz SE's chief economist had warned—but the exact opposite of what AllianzGI had bet—the markets worsened and remained highly volatile.

115.    On March 11, 2020, after the coronavirus spread from China to over 100 other countries, the WHO declared the outbreak a global pandemic.

116.    Against the backdrop of the broad market decline, the returns on AllianzGI's Alpha Funds for the first quarter of 2020 severely underperformed their benchmark indexes.

117.    Specifically, and as shown in the chart below, first quarter 2020 returns were -49.36% for Alpha 250 compared to -19.60% for the S&P 500, and -50.98% for Alpha 500 and -90.81% for Alpha 1000 Plus compared to 0.57% for the BofA 3-Month Index.



118.    The Alpha Funds did not only severely underperform their benchmark indexes—they also performed disastrously as compared to funds with very similar strategies, demonstrating the severe impact of AllianzGI's departure from the Alpha Funds' mandate and its irresponsible and imprudent re-positioning efforts in March 2020.  For example, as reported by Bloomberg on April 8, 2020, funds with comparable options trading strategies, such as those that make up the CBOE Eurekahedge Relative Value Volatility Hedge Fund Index—an equally weighted index of 15 funds with relative value or opportunistic volatility strategies (like the Alpha Funds)—increased by 11.1% in March 2020 (from the end of February 2020), its best month since 2005.  On an overall basis, during March 2020, the funds included in that Index had a positive return of 3.5%.  Similarly, QVR Advisors, which employed a "market-neutral" volatility options strategy similar to the one the Alpha Funds purportedly followed, posted a 52.6% return in March 2020 following a 6.1% return in February.

119.    AllianzGI also either failed to conduct adequate stress tests or ignored their results. Adequate stress testing for dramatic market movements—which Allianz Global Investors and AllianzGI management team purported to perform for the Alpha Funds regularly—if properly done, would have highlighted the risks of a severe, multi-week decline like that which occurred in March 2020.

120.    Specifically, proper stress testing would have revealed the inherent shortcoming of AllianzGI's strategy of hedging short S&P 500 put and call positions with short VIX calls.  Indeed, proper stress testing would have accounted for the well-documented phenomenon of a "phase transition" period where volatility instruments move parabolically higher in times of acute short-term stress—a core feature tested under any reasonable options portfolio analysis.

121.    Adequate stress testing would also have revealed that the Alpha Funds' hedging positions would be entirely ineffective against a market crash and amounted to mere "window dressing."  While AllianzGI nominally maintained more long out-of-the-money S&P put options than short near-the-money options, the strikes and short maturity of the long option positions were always so far away that they were never going to provide any substantive portfolio protection.

122.    The net result of AllianzGI's positioning of the Alpha Funds, including the lack of any meaningful downside hedging positions, was that the Alpha Funds were effectively synthetically almost twice as long as the general market and had "doubled down" on a gamble that the market volatility would subside.  In fact, AllianzGI's own post-mortem analysis of the March period admits that only as of "approximately early March 2020" did it finally give up on this strategy and start to simply outright cover short puts without selling more VIX calls—conceding that it was following an initial "double down" plan until that point.

123.    In breach of its ERISA and common-law fiduciary duties, AllianzGI took the massive risk of "doubling down" on its prior failed strategy in March 2020, without regard for the potential to increase Carpenters Trusts' losses, because AllianzGI needed to reverse the Funds' existing losses by March 31, 2020 in order to salvage its ability to continue collecting performance-based management fees from Carpenters Trusts and the other investors in the Alpha Funds.

124.    Pursuant to the Alpha Funds' Agreements, AllianzGI did not receive a flat management fee, but rather received a performance fee between 20% to 30% of the excess of the "Net Capital Appreciation," or the quarterly increase in the value of the Alpha Funds' net assets pre-withdrawals, allocated to the account of each investor in each of the Alpha Funds for the quarter over the return of the applicable benchmark indexes.  For example, if the BofA 3-Month

Index increased by 10% in a calendar quarter, and the value of Alpha 1000 Plus increased by 12%, AllianzGI was entitled to between 20% to 30% of the 2% overperformance.

125.    However, as a result of a "high-water mark" provision, Allianz received no fees for the management of a Fund if the Fund underperformed its benchmark index.  In addition, Allianz was required to recover the amount of the underperformance through overperformance in future quarters before it could begin receiving fees again.

126.    Specifically, under the Alpha Funds' Agreements, the amount by which a Fund underperformed its benchmark index at the end of a calendar quarter was added to a "Recovery Account."  AllianzGI received no management fees unless the value of the "Recovery Account" was zero.  If the Recovery Account was greater than zero, any overperformance amount at the end of a calendar quarter would be subtracted from the Recovery Account until it reached zero.  Upon reaching zero, AllianzGI would be entitled to begin receiving performance fees again on any end-of-quarter overperformance.  Therefore, a substantial underperformance, like the one experienced in February and March 2020, would cause a substantial increase in the Recovery Account amount, which would need to be offset by massive overperformance before AllianzGI would begin to receive fees again.

127.    AllianzGI assured investors that this incentive structure would not result in excessive risk-taking because, among other reasons, Allianz SE closely monitored the Structured Alpha Funds' risks.  For example, Tournant assured investors that the zero-base-fee structure did not create the risk that Allianz would simply abandon investors should a Fund encounter a period of negative returns.  Describing Allianz as a "master cop," Tournant said that the Alpha Funds would "structurally" never "swing for the fences" or "try to triple down or double down" in the

event of a rough patch, emphasizing that Allianz SE was "monitoring every position" the Alpha Funds took.

128.    Allianz found itself in that very situation of underperformance—and no fees—at the end of February 2020, however, with the Alpha 250 underperforming the S&P by 5%, the Alpha 500 underperforming the BofA 3-Month Index by 10%, and Alpha 1000 Plus declining by more than 20%.  AllianzGI needed to correct this underperformance by the end of the calendar quarter, March 31, 2020, or else it would be required to recover these substantial losses before it could receive any new fees, which would be extremely difficult in a volatile and declining market environment that had exposed the flaws in Allianz Global Investors' management of the Alpha Funds.

129.    In light of the losses that the Alpha Funds had suffered by the end of February 2020, Allianz knew its management of the Alpha Funds would not be profitable for the foreseeable future unless it could reverse the losses before March 31, 2020.  These losses put the entire Alpha Funds' strategy at grave risk as the management and risk controls of the Funds were revealed to be severely deficient.  Indeed, the Alpha Funds' family's structured strategy, with several billions of dollars invested, had historically been extremely lucrative for Allianz, generating substantial profits annually and likely hundreds of millions in fees over its lifespan.  As noted below, in March 2020, investor redemptions across the Alpha Funds' family had begun and would only accelerate.

130.    Given the narrowing prospects for profitability, Allianz was willing to take the high-risk gamble it embarked upon in February 2020—which could result in catastrophic losses for Alpha Funds investors like Carpenters Trusts.  Contrary to AllianzGI's assurances that the zero-base-fee structure would not result in AllianzGI's "swinging for the fences," the fee structure, in fact, led Allianz to do exactly that.  Accordingly, AllianzGI took this unsuccessful gamble

45

throughout March 2020 and continued to short volatility, without any meaningful hedges, at the very time that it was clear to the market that volatility remained high. As a result, the Alpha Funds' losses worsened as volatility increased throughout March 2020.

### F. In a Desperate Attempt to Stem Losses, Allianz Manipulated A Key Volatility Index to Inflate the Alpha Funds' Valuations

131.   Allianz's desperation to generate gains and avoid losses across the entire family of Alpha Funds during March 2020 created the incentive to take extreme risks and further deviate from the mandated investment strategy, including by potentially trading options in order to manipulate downward the settlement price of the VIX futures contract on March 18, 2020.

132.   The Structured Alpha portfolios (including all three Alpha Funds) would benefit from such trading because they had sold a significant number of call options on the VIX that matured on March 18, 2020, with exercise prices around $25-$30. The opening price on March 18 was used to calculate the settlement price of the March VIX futures and option contracts and thus determine the value of the options that the Structured Alpha portfolios had sold. For instance, if a VIX futures contract expiring at the market's open on March 18 settled at $75, each contract would have cost the Structured Alpha Funds about 50 times the index multiplier of 100, or around $5,000 per contract. A higher VIX futures settlement price at the market's open on March 18 would increase those losses substantially, whereas a lower VIX futures settlement price price on March 18 would allow the holder of the March 18-expiring call options contracts to decrease losses significantly.

133.   Between the close on March 17, 2020 and the close on March 18, 2020 the spot VIX Index futures were little changed, reflecting minimal overall change in investors' pricing of volatility. Specifically, on March 17, the VIX closed at $75.91. On March 18, the VIX closed at $76.45, an increase of just 0.7%. In fact, in extended session trading prior to the open on March

18, VIX futures traded as high as $81.95, representing an increase of 8% from the March 17 closing price.  This increase reflected investors' expectations that the VIX would open near $81.95, further signaling an increase in volatility.

134.     However, on March 18, 2020, the VIX opened at $69.37, the low for the day, and at a substantial decline of 8.6% from the March 17, 2020 close, and, critically, a decline of $12.58, or 18%, from the extended session trading occurring immediately before the open, as depicted in the graph below.  The lower opening price on March 18, which was anomalous to the pricing on the prior day, or at any time after the open on March 18, determined the value of the options that AllianzGI had sold to be more favorable to AllianzGI than it would have been had the opening price been higher.  The drop at the opening, followed by a rebound during the trading day, indicates potential manipulation of the open by AllianzGI.



135.     Specifically, on March 18, 2020, the opening auction to calculate the final settlement price for the monthly March 2020 VIX futures and option contracts expiring that day was conducted.  In the opening auction, there was an exceedingly high volume of trading in the

S&P 500 options that are used to calculate the VIX futures settlement price (compared to historical volume data), amounting to four times greater than at any similar auction in the past year or since that time, as indicated in the graph below.



136.    Also, options with very low strike prices, which have a significant influence on the calculation of the VIX, were traded in high volumes and at low prices.  In fact, many of the options traded in the March 18, 2020 auction made little economic sense—as they would only provide an economic benefit in the entirely implausible event the S&P 500 declined by 85%—unless the purpose of those voluminous trades was to artificially lower the settlement price.

137.    The trading in the March 18, 2020 auction is consistent with an effort to lower the settlement price of the March expiring VIX futures.  As an investment manager who had significant exposure to positions affected by the VIX futures settlement price on March 18, 2020 through its management of its Structured Alpha product family, including the Alpha Funds in which Carpenters Trusts invested, AllianzGI had a clear motive to lower the VIX settlement price on that date.

138.    AllianzGI's abrupt decision to cease its regular communications with investors and investment consultants over this time period provides additional corroboration of the suspicious circumstances surrounding these trades.  As Callan informed investors at the end of March, its

48

recommendation to withdraw was based on, among other the things, the "lack of formal communication from AllianzGI during the recent periods of uncertainty."

139.    The manipulation described above would have violated both the investment mandate and the Agreements governing Carpenters Trusts' investments in the Alpha Funds.

### G.    Following the Anticipated Market Conditions in February and March 2020, AllianzGI Liquidated Alpha 1000 Plus and Carpenters Trusts Withdrew Its Remaining Investments in Alpha 250 and Alpha 500

140.    On March 25, 2020, AllianzGI announced via a formal conference call the liquidation of the Structured Alpha 1000 and Alpha 1000 Plus funds.  In a follow up conference call with Callan, investment manager to Carpenters Trusts, AllianzGI informed Callan that the losses experienced year-to-date through March 24, 2020 were estimated at -92% for Alpha 1000 Plus.

141.    The dramatic losses that the Alpha Funds suffered throughout the market downturn were at odds with the structural risk protections that AllianzGI was required to have in place for the Alpha Funds.  Contrary to its obligations to have ample collateral available for flexible restructuring and to always have more long puts than short, the significant portfolio losses and leveraging in the Alpha Funds posed a high risk of a margin call by AllianzGI's prime brokers. Adequate stress testing for dramatic market movements—which the AllianzGI management team and Allianz Global Investors were required to perform for the Alpha Funds regularly—should have highlighted the risks of a severe, multi-week decline and sudden uptick in volatility like that which occurred in February and March 2020.

142.    Indeed, the market downturn in February and March 2020 was hardly unprecedented, and resembled a pattern that has repeated numerous times in various contexts.  The Great Depression saw an 89% decline over a period of about 34 months and the Great Recession saw the markets fall by 49% over a period of 16 months.  On October 19, 1987, commonly known

as "Black Monday," the Dow Jones Industrial Average declined over 22%, the largest single-day decline in history.

143.    In comparison, on March 16, 2020, the date of the biggest one-day drop of the coronavirus-related downturn, the Dow dropped just under 13%.  Over the span of several weeks from mid-February through March 2020, the Dow lost about 35% of its value.  Indeed, a March 31, 2020 research note by AllianzGI acknowledged, "Even though US equity markets have fallen around 25% this year, previous down-turns were worse: markets fell about 50% from peak to trough in 2001 and 2008[.]"

144.    Similarly, periods of sudden spikes in volatility are common and occur at least once a decade.  Tournant himself acknowledged that VIX has ranged from 9 to 90, and AllianzGI purportedly used this prior historical precedent for modeling and stress-testing the Alpha Funds. VIX repeatedly peaked during the period of August 2011 to October 2018, including reaching a high of 50.3 in February 2018 compared to an average of 10.8 for the 30 prior trading days.  On February 5, 2018, a day that would come to be known as "Volmageddon," VIX jumped by a record 20 points.  AllianzGI specifically drew a comparison to that "volatility surge" in its fourth-quarter 2019 commentary for the Alpha Funds, stating, "Structured Alpha's option portfolio is positioned for a strong improvement in the event of another February 2018-type move" as "refinements we have implemented since then as part of our ongoing R&D process have made the option portfolio more resilient."

145.    By late February 2020, as coronavirus-related fears weighed on the markets, media outlets drew comparisons to February 2018, noting a "brutal sell-off in stocks" was causing the SPDR S&P 500 ETF Trust, which tracks the S&P 500, to head for "its biggest weekly drawdown

in two years" since the "biggest-ever volatility spike in an event that came to be known as 'Volmageddon.'"

146.    And yet, despite the ample historical precedent for a market drawdown and sudden volatility surge like what occurred in February and March 2020, and contrary to its purported superior and "proprietary" risk management acumen, AllianzGI's management of the Alpha Funds' portfolios only increased the likelihood of catastrophic losses.  As an investment manager charged with being prepared for market downturns and to have "reinsurance" against catastrophic shocks, AllianzGI was required to have proper hedging positions in place to protect its clients' investments in the event of a sudden downturn.  AllianzGI also should have maintained proper risk management protocol and stress testing to ensure that it remained disciplined with its downside protections.

147.    In late March 2020, in an implicit admission of the failure of the Alpha Funds' recent strategy, Allianz proposed a new portfolio structure that would attempt to capitalize on an attractive volatility environment.  But given AllianzGI's failure to adhere to the Fund mandate, its lack of proper risk management measures, and its disastrous attempt to salvage the portfolio, Callan recommended that its clients terminate its investment in the Alpha Funds "due to the outsized magnitude of realized losses incurred year-to-date 2020, heightened risk related to the ongoing viability of the Structured Alpha platform business due to losses and incentive fee model, and the lack of formal communication from AllianzGI during the recent periods of uncertainty which exacerbates uncertainty regarding the portfolios going forward."

148.    Throughout February and March 2020, AllianzGI provided limited information about the performance of the Alpha Funds and failed to provide Carpenters Trusts with the information required under the Side Letter Agreements about the drastic departure from the Funds' mandate and strategies.

149.    In fact, during the peak of uncertainty from March 9 through March 23, 2020, AllianzGI's lead portfolio managers Greg Tournant and Trevor Taylor did not address to investors the activity in the Alpha Funds or the causes for their severe losses.

150.    In addition, AllianzGI disclosed to Callan for the first time on March 25, 2020 that Tournant was experiencing health issues during February and March 2020.  AllianzGI did not disclose details beyond confirming that the illness was not COVID-19 and stating that Tournant was unable to join client calls, although he purportedly remained able to manage the portfolios day-to-day while ill.  To date, the nature of Tournant's illness and what he was able to do have not been disclosed to Carpenters Trusts.

151.    On April 7, 2020, Carpenters Trusts submitted a request to withdraw its investments in full from Alpha 250 and Alpha 500.

152.    The same day, Morningstar highlighted AllianzGI's negligence in a report titled "A failure in risk management," downgraded the Alpha Funds to "Negative" across all share classes, and recommended that investors avoid the Alpha Funds.  As Morningstar noted, AllianzGI's attempts to restructure the Alpha Funds "expos[ed] a serious weakness in the strategy" and risk management failures and imprudent restructuring efforts actually "locked in the strategy's . . . losses."

153.    Carpenters Trusts suffered losses of at least $261 million on its investments in the Alpha Funds due to AllianzGI's negligent mismanagement of the Alpha Funds.

## COUNT I
## CLAIM FOR BREACH OF FIDUCIARY DUTY (ERISA § 404) AGAINST THE ALLIANZ DEFENDANTS

154.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

155.    Plaintiffs bring this claim pursuant to ERISA §§ 502(a)(2), (a)(3), and 409(a) (29 U.S.C. §§ 1132(a)(2), (a)(3), and 1109(a)).  Plaintiffs have authority to bring this Count under these provisions because Plaintiffs are fiduciaries for the Trusts and the Plans whose assets are held within the Trusts and are authorized to bring suit on behalf of Carpenters Trusts.

156.    AllianzGI was a "fiduciary" pursuant to ERISA § 3(21)(A)(i) (29 U.S.C. § 1002(21)(A)(i)) because it exercised discretionary authority and control over the management and disposition of Carpenter Trusts' Plan assets invested in the Alpha Funds.  AllianzGI exercised full discretion in the management of the Alpha Funds portfolios, including the construction of the option positions, spreads, timing of trades and selection of indexes.

157.    AllianzGI also was an "investment manager" pursuant to ERISA § 3(38) (29 U.S.C. § 1002(38)).  AllianzGI had the power to manage, acquire, or dispose of Carpenter Trusts' Plan assets invested in the Alpha Funds.  AllianzGI also is registered as an investment adviser under the Investment Advisers Act of 1940.

158.     AllianzGI also expressly acknowledged in the Side Letters that it was "an 'investment manager' as defined by Section 3(38) of ERISA."

159.    AllianzGI also acknowledged in writing in the Alpha Funds Side Letters, the LLC Agreements, and the PPMs that AllianzGI was a fiduciary.  In the Side Letters, AllianzGI acknowledged that the "Managing Member[,]" AllianzGI, "hereby confirms that notwithstanding anything in the LLC Agreement, the PPM and the Subscription Agreement, as a registered

investment adviser under the Investment Advisers Act of 1940 granted discretionary investment authority over the assets of the Fund, during any time or times in which the assets of the Fund are deemed to be 'plan assets' for purposes of ERISA, the Managing Member (and any other person having or exercising discretionary authority over the Fund or its assets) shall (i) be considered for all purposes a 'fiduciary' as defined by Section 3(21) of ERISA" and will "discharge its duties with respect to such assets in accordance with ERISA, including without limitation, the ERISA fiduciary standard of care."

160.    In the LLC Agreements, AllianzGI acknowledged that "to the extent that the underlying assets of the Company constitute 'plan assets' within the meaning of ERISA . . . [AllianzGI], in its capacity as 'investment manager' of the Company . . . shall at all times discharge its duties consistent with the standard of care imposed on fiduciaries under ERISA and/or Section 4975 of the [Internal Revenue] Code."

161.    AllianzGI acknowledged in the PPMs that "for so long as the assets of the Fund are treated as 'plan assets' for purposes of ERISA, [AllianzGI] is a 'fiduciary,' as such term is defined by ERISA."

162.    Carpenters Trusts allege, on information and belief, that the underlying assets of the Structured Alpha Funds were "plan assets" pursuant to ERISA § 3(42) (29 U.S.C. § 1002(42)) at the time of Carpenters Trusts' investment because 25% or more of the value of any class of equity interests in each Alpha Fund was held by "benefit plan investors," including Carpenters Trusts, as that term is defined by ERISA and 29 C.F.R. § 2510.3-101(f)(2).

163.    As a fiduciary under ERISA, Section 404(a)(1)(B) of ERISA (29 U.S.C. § 1104(a)(1)(B)) required that AllianzGI "shall discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence

under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]"

164.    Here, that meant AllianzGI was required, among other things, to conduct stress testing of the portfolio to anticipate potential losses in market conditions similar to those that existed in the first half of 2020, to respond prudently in response to the results of those stress tests, to have the trading sophistication and proficiency to navigate and protect the Funds' assets in a wide range of market conditions, including those which existed in the first half of 2020, and to prudently respond in the face of declining fund performance.

165.    AllianzGI breached its fiduciary duty to Carpenters Trusts by failing to structure adequate risk protections into the Alpha Funds' portfolios, failing to conduct or respond to portfolio stress testing, and by failing to act prudently in the face of declining fund performance.

166.    Specifically, AllianzGI failed to hedge the Alpha Funds' holdings against a severe market downturn and failed to build structural risk protection into the Alpha Funds' portfolios.

167.    AllianzGI also failed to conduct adequate stress tests to assess the ability to trade the Alpha Funds' portfolios during times of low market liquidity or disregarded the results of the tests it conducted.

168.    AllianzGI also made unreasonable assumptions for changes in VIX leading up to and during the market downturn in the first quarter of 2020 in light of the contrary evidence undermining those assumptions, or disregarded the assumptions it had in fact made about VIX performance.

169.    Moreover, AllianzGI breached its fiduciary duty to Carpenters Trusts by "doubling down" on its positions in March 2020 and continuing to sell additional short volatility options

rather than prudently exiting losing positions. This doubling down exacerbated Carpenters Trusts' losses. AllianzGI did so, for among other reasons, because AllianzGI would have been unable to obtain fees from Carpenters Trusts or the other Alpha Funds investors for the foreseeable future if it had prudently exited losing positions, but may have been able to continue to receive them if it had successfully executed a high-risk strategy to reverse the decline before the end of the quarter.

170.    Defendants Allianz SE, AAM GmbH, Allianz of America, AAMA Holdings, AAMA LLC, AAMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI under the doctrine of respondeat superior. AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

171.    By virtue of the unified corporate structure of the Allianz Defendants and the relationships among the corporate parents of AllianzGI as alleged above, each of which had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

172.    The Allianz Defendants also each acted in a joint enterprise by and among each other, including by holding out the management of the Funds through the operation of "Allianz Global Investors." In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

173.    As a direct and proximate result of the actions and omissions by the Allianz Defendants set forth above, Carpenters Trusts has sustained actual damages in an amount to be proven at trial.

## COUNT II
## CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST THE ALLIANZ
## DEFENDANTS

174.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

175.     This cause of action is pleaded in the alternative to Plaintiffs' ERISA claim in Count I.

176.     AllianzGI acknowledged it was a fiduciary with respect to the Carpenters Trusts investments in the Alpha Funds and was required to act "solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]"

177.     Further, AllianzGI expressly acknowledged it was Carpenters Trusts' fiduciary. Specifically, AllianzGI acknowledged in writing that it remained a fiduciary to the extent that the underlying assets of any Alpha Fund did not constitute "plan assets" within the meaning of ERISA at any time.  In the Side Letters, AllianzGI agreed that "[d]uring any such time that the assets of the Fund are not treated as 'plan assets' for purposes of ERISA, the Managing Member nevertheless will use its best efforts to discharge its duties consistent with the standard of care imposed on plan fiduciaries under Section 404(a)(1)(B) of ERISA."  In the LLC Agreements, AllianzGI acknowledged "[t]o the extent that the underlying assets of the Company do not constitute Plan Assets [under ERISA], Allianz Global Investors U.S. LLC . . . shall at all times use its reasonable best efforts to discharge its duties consistent with the standard of care imposed on fiduciaries under Section 404(a)(1)(B) of ERISA."  AllianzGI also acknowledged in the PPMs that "[d]uring any such time that the assets of the Fund are not treated as 'plan assets' for purposes of

ERISA . . . [AllianzGI] nevertheless will use its reasonable best efforts to discharge its duties consistent with the standard of care imposed on plan fiduciaries under Section 404(a)(1)(B) of ERISA."

178.    In addition, as a registered investment adviser serving as Managing Member and Investment Manager of the Alpha Funds, AllianzGI owed a fiduciary duty to Carpenters Trusts arising from its advisory relationship with Carpenters Trusts.

179.    Further, the LLC Agreements and Subscription Agreements appointed AllianzGI as Carpenters Trusts' representative and attorney-in-fact with respect to the Alpha Funds, a designation that imposes the fiduciary duty of loyalty on the attorney-in-fact.

180.    AllianzGI exercised full discretion in the management of the Alpha Funds portfolios, including the construction of the option positions, spreads, timing of trades and selection of indexes.

181.    AllianzGI had an obligation to carry out its fiduciary duties with respect to the Alpha Funds with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and with experience and familiarity with options trading, portfolio strategy and market risks would use in a similar situation.  Here, that meant AllianzGI was required, among other things, to conduct stress testing of the portfolio to anticipate potential losses in market conditions similar to those that existed in the first half of 2020, to respond prudently in response to the results of those stress tests, to have the trading sophistication and proficiency to navigate and protect the Funds' assets in a wide range of market conditions, including those which existed in the first half of 2020, and to prudently respond in the face of declining fund performance.

182.    AllianzGI breached its fiduciary duty to Carpenters Trusts by failing to structure adequate risk protections into the Alpha Funds' portfolios, failing to conduct or respond to portfolio stress testing, and by failing to act prudently in the face of declining fund performance.

183.    Specifically, AllianzGI failed to hedge the Alpha Funds' holdings against a severe market downturn and failed to build structural risk protection into the Alpha Funds' portfolio.

184.    AllianzGI also failed to conduct adequate stress tests to assess the ability to trade the Alpha Funds' portfolios during times of low market liquidity or disregarded the results of the tests it conducted.

185.    AllianzGI also made unreasonable assumptions for changes in VIX leading up to and during the market downturn in the first quarter of 2020 in light of the contrary evidence undermining those assumptions, or disregarded the assumptions it had in fact made about VIX performance.

186.    Moreover, AllianzGI breached its fiduciary duty to Carpenters Trusts by "doubling down" on its positions in March 2020 and continuing to sell additional short volatility options rather than prudently exiting losing positions.  This doubling down exacerbated Carpenters Trusts' losses.  AllianzGI did so, for among other reasons, because AllianzGI would have been unable to obtain fees from Carpenters Trusts or the other Alpha Funds investors for the foreseeable future if it had prudently exited losing positions, but may have been able to continue to receive them if it had successfully executed a high-risk strategy to reverse the decline before the end of the quarter.

187.    Defendants Allianz SE, AAM GmbH, Allianz of America, AAMA Holdings, AAMA LLC, AAMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI under the doctrine of respondeat superior.  AllianzGI's conduct was undertaken while carrying out its

routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

188.    By virtue of the unified corporate structure of the Allianz Defendants and the relationships among the corporate parents of AllianzGI as alleged above, each of which had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

189.    The Allianz Defendants also each acted in a joint enterprise by and among each other, including by holding out the management of the Funds through the operation of "Allianz Global Investors."  In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

190.    As a direct and proximate result of the actions and omissions by the Allianz Defendants set forth above, Carpenters Trusts has sustained actual damages in an amount to be proven at trial.

## COUNT III
## CLAIM FOR NEGLIGENCE AGAINST THE ALLIANZ DEFENDANTS

191.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

192.    This cause of action is pleaded in the alternative to Plaintiffs' ERISA claim in Count I.

193.    As Managing Member of the Alpha Funds, AllianzGI owed a duty of care to Carpenters Trusts based on the special relationship, or "privity," arising out of the Agreements and Subscription Agreements between AllianzGI and Carpenters Trusts regarding each of the Alpha Funds.

194.    In addition, the Private Placement Memoranda for the Alpha Funds provided that AllianzGI was "responsible for the general management of the investment portfolios of the Fund[s] under the Operating Agreement[s]."

195.    AllianzGI breached its duty to Carpenters Trusts by failing to exercise reasonable care in properly protecting the Alpha Funds against a severe market downturn.

196.    Specifically, AllianzGI failed to conduct adequate stress tests to assess the ability to trade the Alpha Funds' portfolios during times of low market liquidity or disregarded the results of the tests it conducted.

197.    In addition, AllianzGI abandoned the hedging strategies that it was supposed to have in place to provide structural risk protections to the Alpha Funds in any market environment.

198.    AllianzGI also made unreasonable assumptions for changes in VIX leading up to and during the market downturn in the first quarter of 2020 in light of the contrary evidence undermining those assumptions, or disregarded the assumptions it had in fact made about VIX performance.  There had previously been no less than seven prior instances when the VIX had printed above 50 (and 13 times that it had traded above 35) which Allianz seemingly ignored or elected never to actually be prepared for.

199.    AllianzGI further was negligent by taking actions during the downturn—including by continuing to sell naked short volatility call options at the very time volatility was increasing —that locked in and exacerbated the Alpha Funds' negative returns.

200.    AllianzGI's mismanagement of the Alpha Funds runs contrary to AllianzGI's duty to build "structural risk protection" into its portfolios, as AllianzGI—as Managing Member of the Alpha Funds—was obligated to do on behalf of its investors.

201.    Defendants Allianz SE, AAM GmbH, Allianz of America, AAMA Holdings, AAMA LLC, AAMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI under the doctrine of respondeat superior.  AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

202.    By virtue of the unified corporate structure of the Allianz Defendants and the relationships among the corporate parents of AllianzGI as alleged above, each of which had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

203.    The Allianz Defendants also each acted in a joint enterprise by and among each other, including by holding out the management of the Funds through the operation of "Allianz Global Investors."  In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

204.    The Allianz Defendants are not exculpated from liability under the exculpation provisions of the Agreements as those provisions contain an express exception for acts or omissions that constitute negligence.

205.    As a direct and proximate result of the actions and omissions by the Allianz Defendants set forth above, Carpenters Trusts has sustained actual damages in an amount to be proven at trial.

## COUNT IV
## CLAIM FOR BREACH OF CONTRACT AGAINST THE ALLIANZ DEFENDANTS

206.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

207.    AllianzGI had contractual obligations to the Trusts under the Alpha Funds Agreements, including the Private Placement Memoranda for each Fund, which was incorporated by reference into the Agreements entered into by AllianzGI and the Trusts.   Under the Private Placement Memoranda, AllianzGI as Managing Member was obligated to set up a beta or futures component for each Alpha Fund consisting of various investments to provide exposure to the benchmark indexes.

208.    Further, the Alpha Funds' alpha or options components were supposed to "consist of investments in puts and calls on equity indices through the use of a proprietary model to construct option spreads."  This strategy's stated objective was to "create option based profit zones that, upon expiration of the options, will capture positive payoffs if the level of the underlying index (or other instrument) ends up within the profit zone."  AllianzGI was obligated to "optimize spread positions and profit zones based on (a) targeted positive return potential, (b) structural risk protections, (c) collateral management, and (d) flexibility to restructure profit zones if necessary."

209.    Under the Agreements, AllianzGI could not take any unlawful action in connection with the management of Fund assets.

210.    AllianzGI breached these contractual obligations by failing to build proper risk protections into the Alpha Funds' portfolios in accordance with the stated investment strategy.

211.    Defendants Allianz SE, AAM GmbH, Allianz of America, AAMA Holdings, AAMA LLC, AAMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI under the doctrine of respondeat superior.  AllianzGI's conduct was undertaken while carrying out its

routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

212.    By virtue of the unified corporate structure of the Allianz Defendants and the relationships among the corporate parents of AllianzGI as alleged above, each of which had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

213.    The Allianz Defendants also each acted in a joint enterprise by and among each other, including by holding out the management of the Funds through the operation of "Allianz Global Investors."  In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

214.    As a direct and proximate result of the actions and omissions by the Allianz Defendants set forth above, the Trusts have sustained actual damages in an amount to be proven at trial.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.  A declaration that Defendants are liable for violations of ERISA and breach of the ERISA fiduciary duty in the course of the management of the Alpha Funds, causing Carpenters Trusts' losses;

2.  In the alternative to a declaration for violations of ERISA, a declaration that Defendants are liable for breach of common-law fiduciary duty in the course of the management of the Alpha Funds, causing Carpenters Trusts' losses;

3.  In the alternative to a declaration for violations of ERISA, a declaration that Defendants are liable for negligence in connection with the management of the Alpha Funds, causing Carpenters Trusts' losses;

4.  A declaration that Defendants are liable for breach of contract in connection with the management of the Alpha Funds, causing the Trusts' losses;

5.  A money judgment against Defendants in an amount exceeding $75,000.00, the amount to be determined at trial;

6.  An Order awarding pre- and post-judgment interest to Carpenters Trusts; and

7.  An Order awarding to Carpenters Trusts any such equitable/injunctive or other further relief as the Court may deem just and proper.

## VI.   JURY DEMAND

Plaintiffs demand a trial by jury as to all issues so triable.

Dated:  November 11, 2020                    Respectfully submitted,

_/s/ Hannah Ross_
**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
Hannah Ross
Avi Josefson
James Harrod
Michael Blatchley
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

_Counsel for Plaintiffs the Boards of Trustees for the Carpenters Health and Security Trust of Western Washington and the Group Investment Trust of the Carpenters Individual Account Pension Trust of Western Washington and the Carpenters Retirement Trust of Western Washington, the Carpenters Health and Security Plan of Western Washington, the Carpenters of Western Washington Individual Account Pension Plan, and the Carpenters Retirement Plan of Western Washington_

# APPENDIX A

